WILLIAM J. CONNELL v. STATE OF NEBRASKA.

FILED DECEMBER 18, 1907.   No. 15,112.

1. **Contempt.**  A prosecution for contempt of court is a criminal pro-
   ceeding.   The defendant is entitled to the benefit of any reason-
   able doubt as to his guilt.

2. ————: VENUE: TRIAL BY JURY.   When the acts complained of are
   done in the presence of the court, the defendant is not entitled
   to a change of venue on account of alleged prejudice of the court,
   nor is he entitled to trial by jury.   The fact that the prosecution
   for contempt is postponed until the end of the proceedings in
   which the contempt is alleged to have been committed will not
   change the character of the prosecution.

3. ————: INFORMATION: FINDINGS: EVIDENCE.   When the prosecution
   for contempt is based upon language used by counsel in open
   court in the trial of a cause, and the words used are not in
   themselves necessarily contemptuous, and the court orders a

prosecution instituted by information filed by the county attorney, and a formal trial is had, there being no statement of the court in the record as to the conduct of counsel upon which the proceedings are based, general findings of the court will be considered as predicated on the evidence in the record, and unless supported by that evidence will not sustain a judgment of guilt.

ERROR to the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Reversed.*

*William J. Connell* and *Hall & Stout,* for plaintiff in error.

*W. T. Thompson, Attorney General, Grant G. Martin* and *James P. English, contra.*

SEDGWICK, C. J.

This is in some respects the most extraordinary record that the writer has ever been called upon to examine. It contains over 500 sheets of closely typewritten matter and some 40 odd sheets of fine print. All of this record is supposed to be devoted to presenting, emphasizing and illustrating a continuous controversy between the court and the defendant, who is a member of the bar of Douglas county, in the trial of a misdemeanor case, entitled "State of Nebraska v. Samuel E. Howell," in which that defendant was indicted with some 40 others. This controversy extended not only through the trial of the case, but through the settlement of the bill of exceptions in that case, and throughout the trial of this case which is now presented to this court. The record clearly shows that the trial judge, which would, of course, be presumed without such showing, was animated throughout by a fine sense of justice, and was using every possible effort to maintain the dignity of the court and the honorable reputation of the bar of the state, and was conscious of the character of the disgraceful proceedings throughout, and yet was unable to preserve that order and decorum which is essential to the due administration of justice. The defendant is one of the able lawyers of the state, of long practice in all the

courts, and has held positions of great influence in the
public service. Judging from this record, he is evidently
fearless in the defense of the interests of his clients, and
is willing, if it seems at the moment to be necessary, to
make great sacrifices to promote their cause. These char-
acteristics, of course, challenge the admiration of the
courts, and yet it is equally manifest, we think, from this
record that due consideration on the part of the defendant
of the duties of counsel in the trial of causes and the proper
exercise on his part of the ability of a strong lawyer to
assist the court in the discharge of its arduous duties
would have avoided all difficulty, and so it may be said
that the record shows that the defendant is at fault. It is
not necessary to go into this voluminous record in detail.
That part of it which it will be necessary to quote in de-
termining the legal questions presented will sufficiently
illustrate the character of the proceedings. At the end
of the trial of the principal case, the court directed the
county attorney, who is also the attorney for the prosecu-
tion in the principal case, to file an information against
this defendant, who was the leading counsel for the defend-
ant in the principal case, charging the defendant with con-
tempt of court in the process of that trial. In making this
order the court directed the precise language used by the
defendant, and apparently taken from the record, pre-
served of the former trial, which should be charged in the
information against the defendant as the ground for the
proceedings for contempt. There were six counts in the
information filed by the county attorney, and the defend-
ant was found guilty as to two of the respective charges.
It will therefore be unnecessary to discuss the remaining
accusations.

1. The first count in the information upon which the
defendant was found guilty charged: "After the said court
had heard the said William J. Connell in his argument of
the law of said case, on behalf of the defendant therein,
and after the said court had announced to the said Wil-
liam J. Connell that the said court did not care to hear

any further argument on the law of said case, the said
William J. Connell, in answer to said announcement of
said court, did then and there in a disorderly, contemptu-
ous and insolent manner, and in a loud, boisterous, disre-
spectful and sarcastic tone of voice, with the intent on the
part of said William J. Connell then and there and thereby
to intimidate, humiliate, insult and lower the dignity of
the said court in the presence of a large number of by-
standers and visitors, then and there being present in said
court, use the following language toward said court, to-
wit: 'I don't want to say that I have lost faith in the court,
but I will go to the extreme of saying that I do not think
that any law that I could produce to your honor would be
of much effect. I have got it (meaning the law) out of
the Nebraska reports, and the supreme court is responsible
for the law. I do not make the law. I merely find it and
bring it into the court'—contrary to the form of the statute
in such cases made and provided, and in contempt of said
district court and its dignity and against the peace and
dignity of the state of Nebraska." After the trial of the
Howell prosecution an attempt was made to settle the bill
of exceptions, and it appears from the record that a tran-
script of the evidence taken in that case was procured and
was agreed upon between the counsel for the respective
sides, but had not been allowed by the court and ordered
to be made a part of the record. From this transcript
extracts were presented and offered in evidence. Some
objections were made to their being received. After some
hesitancy they appear to have been received, and also ap-
pear to have been relied upon by both parties to this con-
troversy as substantially showing the facts. In settling
the bill of exceptions in this case, the judge has certified
that the transcripts alluded to are not correct, and refers
to the examination of the defendant, Connell, by the court
as showing the incorrectness of these transcripts. This
examination shows that the transcripts were not a part
of the records of the court, and that the copy of the evi-
dence of the former case from which the transcripts were

taken had never been allowed by the court as the bill of exceptions in that case. It is, however, admitted upon all hands that the supposed offensive language of the defendant was preceded by more or less controversy between the parties, and no attempt is made by any one to show what that controversy was, except as disclosed in the transcripts referred to. Neither has any one attempted seriously to show in what respects these transcripts are defective or incorrect, and as they are in evidence, and assumed by counsel on both sides to be substantially correct, we think they must for the purposes of this case be so considered. It appears then from the record that, while the prosecuting attorney was questioning a witness in the trial of the Howell case in regard to some record that had been received in evidence, a discussion took place which led to the supposed offensive language of this defendant. This discussion was as follows: "Q. Now, referring to the entry opposite C. B. Havens & Company under June 10, 1905, the figures 5 and two ciphers following, what does that mean, $5 or what? Objected to for the reason that the book itself is the best evidence. We object that it is immaterial and irrelevant. We further object that it does not tend to sustain the charge or does not tend to sustain any count in this indictment. We further object that it relates to a date and a time prior to the time when the existing law under which this prosecution went into force. Objection overruled and defendant excepts. Mr. Connell: That was a point I wanted to present, your honor, but if your honor has made up your mind not to hear any discussions or presentation here why I don't care to go into that. The court: You have argued so much law that I thoroughly disagree with that I have kind of lost faith in the law you present to the court, and if I thought there would be anything gained by this discussion I would be glad to hear it. Mr. Connell: I don't want to say I have lost faith in the court, but I will go to the extreme of saying that I do not think that any law that I could produce to your honor would be of much effect. The court: Per-

haps that is because you have argued bad law to the court
for a long time, and the court, I suppose— Mr. Connell:
I have got it out of the Nebraska reports, and the supreme
court is responsible for the law. I do not make the law.
I merely find it and bring it into court. Objections over-
ruled. Defendant excepts."

It appears to be conceded in the findings of the trial
judge that the language used by defendant would not nec-
essarily in itself be contempt. The contempt was con-
sidered to consist in the manner of the defendant and the
circumstances under which the language was used. The
foregoing extract from the transcript illustrates two un-
fortunate conditions that existed during the whole trial.
The trial judge was led into controversy and argument
when nothing was required but prompt decision. He
allowed himself frequently to be interrupted when at-
tempting to explain the grounds of his ruling, and habitu-
ally allowed extensive argument after having indicated
his opinion upon the point under discussion. The objec-
tion to the question propounded to the witness, it appears,
was stated at large by counsel, and after the objection had
been flatly overruled, and counsel had taken his exception
to the ruling, counsel stated that the point was one that
he wanted to present, but if the mind of the court was
made up not to hear any presentation that he would not
care to go into it. Ordinarily such a remark as this in
open court would be regarded as more or less offensive.
The implication plainly is that the point determined by
the court was an important one; that it merited discus-
sion, and the insinuation is that the court had made an
important ruling without proper consideration of the mat-
ter, and that this indicated a condition of the mind of the
court that made it undesirable to discuss the question.
What we mean to say is that under some circumstances
such a remark as this of counsel would be subject to such
criticism as above, but the reply of the court would indi-
cate that such discussions were anticipated and not rarely
to be expected. The remark of the court that he had lost

faith in the law presented by counsel might be understood
to call for some excuse or explanation on the part of
counsel. The answer of counsel that "I do not think that
any law that I could produce to your honor would be of
much effect," taken literally, is merely a confirmation of
the statement of the court. The difference in the two ex-
pressions consists in the inference to be drawn from each
respectively. The one undoubtedly infers that counsel was
in the habit of citing law to the court which was unre-
liable; while the other infers that the court was in the
habit of disregarding the law when it was correctly cited
by counsel. Such language on the part of either court or
counsel can be accounted for only by the excitement which
comes from the heat of unnecessary discussion and of a
character to be carefully avoided. The court, instead of
taking immediate measures to prevent such discussion in
the future, continues it by a remark calculated to produce
the reply which followed. The court intimates that coun-
sel has attempted to deceive him by citing unreliable
precedents, and counsel attempts to justify by stating the
source of his authorities, a source which is regarded as
legitimate, at least in the courts of this state. Thereupon
the objection is again overruled, and another exception
taken.

The charge of the other count of the information upon
which the defendant was found guilty is as follows: "The
defendant did then and there in the presence and hearing
of said court, and in the presence and hearing of the pre-
siding judge thereof, said court then and there being in
session as aforesaid, and engaged in the trial of said case,
unlawfully and wilfully behave toward said court in a
disorderly, contemptuous and insolent manner, in that
then and there and during said trial of said case, and in the
presence and hearing of the jury impaneled in said case
as aforesaid, and after the said court had passed upon the
qualifications of a certain witness, called by the said de-
fendant in said case to testify in said case, and had ex-
cluded said witness from testifying in said case, pursuant

to an order of the said court theretofore made at the opening of the trial of said case forbidding the witnesses in said case to be present in said court during the progress of the said trial of said case when other witnesses were testifying therein, the said William J. Connell did then and there in a disorderly, contemptuous and insolent manner, and in a loud, boisterous, disrespectful and sarcastic tone of voice, with the intent on the part of said William J. Connell then and there and thereby to intimidate, humiliate, insult and lower the dignity of the said court in the presence of said jury and in the presence of a large number of bystanders and visitors then and there being present in said court, use the following language toward said court, to wit: 'Now, your honor, I contend and insist that to exclude any witness called by the defense, simply because that witness has violated some order of the court, and the defendant himself is not a party to it, would be not only the rankest injustice, but would be error of the grossest character.'" We cannot find any other substantial proof of the exact language attributed to the defendant in this count of the information and the preceding controversy that led to its use, except that contained in the transcripts from the proposed bill of exceptions above referred to, and for the reasons already given, we think that we must take those transcripts as furnishing the evidence upon that point, and they show the following proceedings: "George E. Griffith, called as a witness on behalf of the defendant, being first duly sworn, was examined in chief by Mr. Stout, of counsel for the defendant, and testified as follows: Q. You may state your name to the court and jury. A. George E. Griffith. Q. Where do you reside? A. 2823 Dewey avenue, Omaha. Q. How long have you lived in Omaha? A. Since the 16th of March, 1905. Q. What is your business? A. I am employed by the Union Fuel Company. Q. Where is the Union Fuel Company's place of business? A. 1614 Farnam street. Q. What is the nature of your business with the Union Fuel Company? A. I am employed in the capacity of bookkeeper

and solicitor. Q. In what way do you exercise that duty of yours as solicitor? Mr. Murdock: Has this man been in the court room? Immediate cross-examination by Mr. Murdock: Q. Have you been in the court room during the progress of this trial? A. I was in here for a short time one evening. Q. At the time of the taking of testimony? A. Yes; I was in here Thursday evening, I believe; no, it was Wednesday evening. Mr. Murdock: Object to the witness testifying. Mr. Stout: His instructions have been to stay out. Mr. Connell: That can make no difference. Mr. Connell: Were you aware that you would be a witness when you were in here that evening? The court: The court allowed Mr. Sunderland to testify because he was one of the defendants. Mr. Stout: If the witness is disqualified— Mr. Connell: My position is that he cannot be disqualified. The court: The court made the order, and told counsel that order would be enforced. Mr. Connell: I want to show by this witness that he was not present when your honor made that order; that he did not know anything about it; that he never expected to be a witness when he was called; and we wish to state, professionally, to the court, on my part and on behalf of my associate, Mr. Stout, we did not know that we would have to call him as a witness. I did not have the remotest idea that he would ever be a witness until well into yesterday; and, that being so, we ask and demand that his testimony be taken. Now, my understanding of the rule is this, your honor, that a party cannot be deprived of the right to use a witness simply because the witness violates some order of the court. If this witness has violated any order of the court, knowing that he was to be a witness, and has come into the court room, he would be liable for contempt of court; he would be punishable, himself, for contempt of court. But it cannot be, your honor. Suppose that Mr. Howell, in place of being on trial for an act in restraint of trade, was on trial for his life, and that this was the only witness by whom he could prove his innocence, and the witness has violated the order of the

court; is it possible that he must be denied his right to present that testimony, and go upon the executioner's platform, because the witness, the only witness who could testify in his own behalf, has wilfully, we will say, violated an order of the court? Now, your honor, I contend and insist that to exclude any witness, called by the defense, simply because that witness has violated some order of the court, and the defendant himself is not a party to it, would be not only the rankest injustice, but would be error of the grossest character. The court: Then we will have error of the grossest character. Now, I do not like that remark—grossest, rankest injustice. Now, Mr. Connell, you have been making free use of such remarks, and some time you are going to find out this court is not going to permit that any more. Mr. Connell: I do not believe, your honor; I do not know what your honor's ruling would be. I am merely submitting that proposition, and I thought the mere statement of the result of that rule would satisfy your honor that it would not be the proper thing. The court: The trouble is you have tried to blackguard the court all through this case by insinuations, and you are undertaking to carry things with a high hand, whether right or wrong. This is not a murder case, and the court has a right to make any reasonable rule, and it must not be violated. In this case the defendant is charged with a misdemeanor. The court would have no way of enforcing its order if any witness could come in here, if he sees fit, and violate the order of the court. Mr. Connell: He could be punished for contempt. The court: The court is not looking for contempt cases at all. The court is looking for the enforcement of its orders. The court allowed Mr. Sunderland to testify, even though he had been in the court room while testimony was being given, because he was one of the defendants in this case. Mr. Connell: We except to the ruling of the court."

From this it appears that, when defendant, as counsel in the case, stated his position to the court that the wit-

ness Griffith could not be disqualified, the court replied: "The court made the order, and told counsel that order would be enforced." This ought to have ended the controversy. This was a plain intimation that the court had considered and had determined that the order made at the commencement of the trial, excluding all witnesses from the court room, and directing that no witness should be examined who remained in the court room in violation of the order, applied to the witness Griffith; and, the court having come to this determination, there was no further necessity for debate; but it will be seen that Mr. Connell proceeded to argue the question at large. No one appears to have objected to this argument. The argument appears to be substantial, and on its face would appear to be in good faith, except for the fact that the point had already been determined. But the court listened to the argument. No attempt was made to prevent or restrict it, and at the close of the argument the court treated it as an attempt on the part of counsel to "blackguard the court." It must be considered that the language used by counsel was not as choice and delicate as might be desired. He tells the court in closing his argument that "to exclude any witness called by the defense (under the circumstances then existing) would be not only the rankest injustice, but would be error of the grossest character." The court apparently considered that the point had already been decided; and counsel himself concedes that there was reason at the time to suppose that the court would exclude the testimony, and he characterizes the proposed action of the court as "the rankest injustice, and error of the grossest character." We are not now considering the tone of voice, the gesticulations, or the manner of the defendant, other than as indicated by the language itself. Mr. Connell, as a witness in his own behalf, testified that he was applying, at least in his own mind and intention, his characterization of the nature of such a ruling to the illustration which he himself had proposed in his argument, and that he did not at the time have in mind charac-

Connell v. State.

terizing the proposed ruling of the court upon the question before it. His explanation at the time to the court, as disclosed by the record, tends to support him in this testimony, and might have been taken as purging him of any intentional contempt of court in making the offensive remark—"I do not know what your honor's ruling would be. I am merely submitting that proposition, and I thought the mere statement of the result of that rule would satisfy your honor that it would not be the proper thing." The reply of the court to this expression shows that under ordinary circumstances the explanation of counsel would have been regarded by the court as sufficient. It was only in the light of the general conduct of counsel during the course of that trial that the court regarded the language as offensive. Undoubtedly very much must be confided to the discretion of the trial court in the characterization of the language of counsel which might or might not be regarded as contemptuous, so much depends upon the circumstances surrounding the use of the language, and upon the manner of counsel in using it, and other matters, that the record cannot be made to show that a reviewing court must in ordinary cases rely upon the judgment and discretion of the trial court, which is based in a large degree upon his personal observations and knowledge. This subject will be considered further in connection with the allegations of the information that the defendant acted in a "disorderly, contemptuous and insolent manner." This is a criminal proceeding in its nature. The defendant is entitled to the benefit of any reasonable doubt as to his guilt. The language used by the defendant as charged in these two counts of the information, under the circumstances disclosed by the evidence, and in the light of the inducements and explanations contained in the record, would not of itself furnish sufficient proof that the defendant beyond reasonable doubt committed and intended to commit a wilful contempt against the authority and dignity of the court.

2. This is not a prosecution for a constructive contempt.

The acts complained of were done in the presence of the court itself. The fact that the court delayed the proceedings for contempt until after the principal case was finished would not change the character of the proceedings. It was the duty of the court to hear the matter himself, and the defendant's application for a change of venue was rightly overruled. These two propositions are elementary, and in the view that we take of the case they become unimportant, except as they bear upon the question which we come now to consider, and which we deem to be the most difficult and important question in the case. Did the defendant act in "a disorderly, contemptuous and insolent manner"? Did he speak to the court "in a loud, boisterous, disrespectful and sarcastic tone of voice"? Did he intend and attempt "to intimidate, humiliate, insult and lower the dignity of the court"? It appears to be conceded that the language used by the defendant might have been used with such manner and purpose as these questions indicate, or might have been used in the heat of the debate without malicious intent with the purpose as explained and insisted upon in the testimony of the defendant. The trial court saw the conduct of the defendant. He observed his manner, his tone of voice, and the circumstances under which he spoke. He was manifestly, as shown by the record, endeavoring to do his whole duty, and to conduct the trial in a seemly and appropriate manner. He has made a general finding in the case that the defendant "unlawfully and wilfully did behave toward said court in a disorderly, contemptuous and insolent manner, in that then and there and during the trial of said case, and in the presence and hearing of the jury impaneled in said case as aforesaid, and after said court had passed upon the qualification of a certain witness, called by the said defendant in said case to testify in said case, and had excluded said witness from testifying in said case, pursuant to the order of said court theretofore made at the opening of the trial of said case forbidding witnesses in said case to be present in said court during the

progress of said trial of said case when other witnesses were testifying therein, the said William J. Connell did then and there in a disorderly, contemptuous and insolent manner, and in a loud, boisterous, disrespectful and sarcastic tone of voice, with the intent on the part of said William J. Connell then and there and thereby to humiliate, intimidate, insult and lower the dignity of the said court in the presence of said jury and in the presence of a large number of bystanders and visitors then and there being present in said court, use the following language toward said court, to wit: 'Now, your honor, I contend and insist that to exclude any witness called by the defense, simply because that witness has violated some order of the court, and the defendant himself is not a party to it, would be not only the rankest injustice, but would be error of the grossest character.' That said language was used by the defendant wilfully, unlawfully, contumaciously, and in contempt of this court, and was an attempt of said defendant to obstruct the proceedings and hinder the due administration of justice in said case then pending and on trial before this court. The court therefore finds the defendant guilty as set forth in the first, second, third and fourth counts of the information."

It is contended that these findings are sufficient to support the conviction without regard to the evidence; that the language and actions of the defendant and the manner in which the language was used and the actions were done were necessarily within the personal knowledge of the judge, and that the specific charge of the manner of the defendant and specific finding and statement of the judge thereon required the rendering of the judgment that followed. We do not want to be understood as deciding that in ordinary cases something more is necessary than the statement of the facts upon the record and the findings of the court thereon to support a conviction of contempt committed in the presence of the court. In this case we think that the judgment is not supported by the record. Instead of relying upon the knowledge of

the court and inflicting summary punishment upon a contumacious attorney, the court directed the formality of a legal trial. It was stated from the bench that the matter was left in the hands of the county attorney, and the state called and examined numerous witnesses to prove, not only the fact of the use of the language alleged, but also definitely and specifically the manner and tone of the voice of the defendant and all of the surrounding circumstances and conditions, assuming the burden of proving in the ordinary way all of the matters alleged in the information. The findings of the court are borrowed literally from the information, and contain the most of the allegations of the information in the language and form in which the matters are charged. Outside of these formal findings there is no statement of the court in regard to the transactions that took place in the presence of the court. The findings are manifestly based upon the information and the evidence, and must be taken as reflecting the views of the court as to the facts established by the witnesses examined, and not from his own knowledge.

Among the witnesses examined for the state were the two bailiffs of the court, and the testimony of the witness Kirkendall, one of the bailiffs, fairly shows the evidence upon which the findings and conviction are based. This witness appears to be very observing and conscientious. He was questioned by the prosecution, and answered as follows: "Q. Was the language used by Mr. Connell, just quoted, spoken in a voice loud enough so that the people back in the court room would be able to hear it? A. I judge that any one in the court room could hear it. He did not say it in a very boisterous manner, but he said it so that any one in the court room might have heard it. I was sitting back there in my chair, and I heard it. Q. What was Mr. Connell's manner and demeanor, and what was the tone of his voice at the time he addressed the language quoted to the court? A. Well, I thought that he spoke in what I would consider a kind of natural tone

of voice for Mr. Connell.  He talks very loud, but he spoke
it in a kind of, that is, he finished it up, if I remember
right, in a kind of half laughing manner, as though he
had no confidence in bringing—"  He was then inter-
rupted, and, being told by the court to continue his
answer, answered further as follows: "A. Well, he spoke
it as though he thought it was useless to—he left the
impression that he thought it would be useless to add
any more law.  He left the impression that he did not
think it would carry any weight with it.  That is the
nearest I could give it.  Q. What do you say, Mr. Kirken-
dall, as to whether the tone of voice used by Mr. Connell,
when he employed that language, was respectful or disre-
spectful to the court?  A. Well, now, that is hard for me
to answer.  If I was to use my own judgment, I would
say that I did not suppose that Mr. Connell cared much
for the court—respected the court a whole lot in that
statement.  Q. I will ask you to state whether the tone
of his voice, when he used the language referred to, was
sarcastic or otherwise?  A. No; I don't know as it was.
I thought it was a kind of natural tone of voice for Mr.
Connell.  Q. Have you stated, now, the manner in which
his tone and conduct impressed you when he was using
that language?  A. I think I have."  This related to the
first and second counts in the information.  As to the
third and fourth counts in the information he was ques-
tioned, and answered as follows: "Q. Were you also pres-
ent in the court room, Mr. Kirkendall, during the trial
of the case of the State of Nebraska against Howell, when
the defendant, William J. Connell, addressed the court,
his honor, Judge Sutton, then presiding, in the following
language: 'Now, your honor, I contend and insist that to
exclude any witness called by the defense, simply because
he has violated some order of the court, and the defendant
himself is not a party to it, would be not only the rankest
injustice, but would be error of the grossest character'?
A. Yes, sir.  Q. I will ask you to state what tone of voice
Mr. Connell used when he employed the language quoted?

A. Well, in that statement, I think he used a kind of animated tone of voice. Q. Could you say as to whether it was boisterous or not? A. Well, it was very loud. Q. Was it unusually loud? A. Yes, sir. Q. What would you say as to whether or not the language used by Mr. Connell toward the court was used in an insolent manner or otherwise? A. Well, I don't know as to that. I was off that distance. I could hear it plainly. I could not see his face. Q. What would you say as to whether it was in a disrespectful or respectful tone of voice? A. Well, it sounded to me as challenging the judge on excluding the witness. Well, I don't know how you want me to answer that, unless I can answer it in my own way. Q. Read the question. A. I heard the question. Q. What would you say, Mr. Kirkendall, as to whether the tone of voice was respectful or disrespectful? A. Well, it sounded to me, of course, disrespectful, for the reason that it sounded as if he was issuing a challenge to the judge for excluding the witness from the chair on account of being in the room during the trial."

There appears to be two statements of this witness that tended perhaps in some degree to support the allegations of the information. When asked the leading question by the state's counsel in regard to the language of the defendant, "Was it unusually loud?" he answered, "Yes, sir," and he says that "it sounded to me, of course, disrespectful." But the reason for this latter conclusion is derived, as appears from his answer, entirely from the language itself, and not from the manner in which it was used. If the witness had understood that the question as to excluding the testimony of the witness, Griffith, was still undetermined, and that the court might yet conclude to allow the evidence, and was listening to the argument for the purpose of determining the propriety of so doing, this witness undoubtedly would not have considered the language used as disrespectful. We cannot add to this opinion, already too long, by quoting further from the evidence of the state's witnesses. There was none more

convincing than the evidence of the witness Kirkendall. The defendant testified as a witness in his own behalf. He plainly and unequivocally explained the language used, the circumstances under which it was used, and his purpose and intention in using it. If his evidence is to be believed, it completely purges him of contempt.

The evidence fails to show beyond a reasonable doubt that the defendant was guilty of a wilful purpose to obstruct the proceedings of the court, or to insult or humiliate the judge either by boisterous behavior, by loud or sarcastic language, or by offensive and insulting demeanor.

The judgment of the district court is reversed and the cause remanded.

REVERSED.